NELSON P. COHEN
United States Attorney

AUDREY RENSCHEN and
KIMBERLY R. SAYERS-FAY
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
(907) 271-5071
audrey.renschen@usdoj.gov
kim.sayers-fay@usdoj.gov

ALEXANDRA R. GELBER
Trial Attorney
US Department of Justice
Criminal Division, Child Exploitation and Obscenity Section
1400 New York Ave, NW, Suite 600
Washington, DC 20530
Phone: (202) 307-1316
email: Alexandra.Gelber@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>   vs.<br><br>DON ARTHUR WEBSTER, JR.,<br>  aka Jerry Starr, aka "Daddy",<br><br>               Defendant. | Case No. 3:06-cr-0096-JWS-JDR<br><br>**NOTICE OF CALCULATIONS OF MANDATORY RESTITUTION UNDER 18 U.S.C. § 1593** |

COMES NOW, the United States of America, by and through counsel and gives notice of its calculations of the mandatory restitution due to Defendant Webster's victims pursuant to Title 18, United States Code, Section 1593.

I.   FULL RESTITUTION IS MANDATORY

Title 18 U.S.C. § 1593 provides that the court "shall direct the defendant to pay the victim . . . the full amount of the victim's losses." *Id.*  Section 1593 further explains that the "full amount of the victim's losses" means the "greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act."  18 U.S.C. § 1593(b)(3).

II.  USING THE GROSS PROCEEDS METHODOLOGY, WEBSTER OWES HIS VICTIMS MORE THAN $3.6 MILLION.

The United States has calculated the restitution due to Webster's victims in both of the aforementioned ways.  The gross income methodology yielded the greatest restitution amount for victims: over $3.6 million.  The government arrived at this estimate of Webster's ill-gotten gains by using the following formula for each victim:

>    WEEKS TRAFFICKED X  5 DAY WORKWEEK X  NO. OF CSAS/ DAY  X  $170  =
>
>    WEBSTER'S GROSS INCOME FROM TRAFFICKING

Attached hereto as Exhibit A is an Excel spreadsheet that shows the calculations for each victim.[1]  As a starting point for the calculations, the government used the "days trafficked" estimate that the court previously adopted at sentencing to approximate the drug quantities involved.  To be conservative, however, the government once again assumed a 5-day work week, though the victims made it clear that they worked every day unless they were crashing from crack use.  The $3.6 million estimate of Webster's gross revenue is likely well under the mark for another reason: the government assumed that Webster took in only $150.00 for each commercial sex act he procured, when in fact testimony showed that he charged much higher rates, particularly in the later years of his scheme.

III.  USING THE FLSA METHODOLOGY, WEBSTER OWES HIS VICTIMS MORE THAN $2.1 MILLION.

The United States also worked with the United States Department of Labor to calculate the "value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act."  Using this alternative

---

[1] Because the spreadsheet exhibits in their ECF-required PDF format, present very small, often illegible writing, the government will also provide courtesy hard copies and electronic copies of the Excel spreadsheets on disk to the court and defense counsel.

methodology, the government calculates that Webster owes the victims roughly $2.2 million.

The calculations that underlie this second methodology are presented in Exhibit B. These calculations are more complex, in part because Webster's scheme was so long-running that it spanned a change in the Alaska minimum wage.

For each victim, the government first had to determine how many weeks Webster trafficked her before January 1, 2003 – when Alaska's minimum wage changed from $5.65/hr to $7.15/hr – and how many weeks Webster trafficked her after that date. Victims Sullivan, Rainey and Ross testified to when Webster recruited them, which facilitated this task. For several others, however, including Beasley, Houser, and Weatherman, the testimony did not lend itself to such precision. Accordingly, for this latter group of victims, the government assumed that half of the weeks each woman was trafficked occurred before 1/1/03 and half occurred after, although this assumption undoubtedly inures to the detriment of these victims. In this regard, the government consistently utilized numbers and assumptions that favor defendant.

Once the "weeks trafficked" figure for each period was determined for each victim,[2] that number had to be multiplied by the daily hours.  For the vast majority of the victims, the "daily hours" number is 24.  According to the DOL, this number comports with victim testimony about working conditions.  As the pertinent regulation provides, "Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked. He is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he will not have to commence work until a definitely specified hour has arrived." 29 CFR § 785.16  (Off Duty).  By contrast,  "An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is "working" while "on call". 29 CFR § 785.17 (On-Call Time); *see also United States v. Liu*, 538 F.3d 1078, 1089-1090 (9th Cir. 2008)(approving restitution calculation in sex trafficking case that assumed "no time off for evening or weekends"; *United States v. Sabhnani*, 566 F. Supp. 2d 139, 142-143 (E.D.N.Y. 2008) (Declining to subtract sleep and meal periods from daily hours because both were infrequent and  unpredictable).

---

[2] For some individuals, the victimization occurred either entirely before or entirely after the minimum wage change, which simplified this task.

In this case, the employee/victims were expected to work 7 days a week, at all hours of the day and night. They were to be available and "on-call" at any time, and did not have time allocated for their own purposes. Therefore, the 24-hour work day is applied to all victims except Houser and Ross, who testified that they were regularly afforded sleep. For these two women, the DOL assumed at 16-hour work day.

At the direction of government counsel, the DOL assumed that all the women worked five days per week. This assumption is quite conservative, because the women consistently testified that they had no "days off." They worked every day until they finally crashed from crack use, at which time they were permitted some sleep.

When one multiplies the "Daily Hours" by the 5 day work week, it becomes clear that all these women were working "overtime." Under governing regulations, for every hour in excess of 40 that an employee works per week, and employer must pay that person an overtime premium that is equal to 1/2 his or her hourly wage. Thus, for example, Sullivan was working 120 hours per week. For the pre - January 1, 2003 period, she's owed $5.65/ hr for all of those hours, and an additional $2.83 for 80 of those hours. These totals, multiplied by the total number of applicable

weeks, appear under the columns labeled "Straight Time Due" and "Overtime Due." The sum of these two columns is the "Back Pay Due."

In theory, the back pay an employer owes an employee can be reduced by the value of food and shelter he provided.  In this case, however, Webster is not entitled to credit for providing food and shelter for the victims.  Under 29 CFR §§ 531.3(d)(1) and 531.32(c), "The cost of furnishing 'facilities' found by the Administrator to *be primarily for the benefit of the employer* will not be recognized as reasonable and may not therefore be included in computing wages (emphasis supplied)." Furthermore, in order to be considered "wages" in a typical labor case, the regulations at 29 CFR § 531.30 state that the facility must be "customarily furnished" to the employee, and, "not only must the employee receive the benefits of the facility for which he is charged, but it is essential that his acceptance of the facility be voluntary and uncoerced." In other words, housing that is creditable must provide a "homelike" setting.

Webster coerced his victims into living in houses he maintained that were under his control. The victims had no choice to live independently, and did not have the freedom to engage in private pursuits. They were required to work on a daily basis, and were under constant threat of punishment for breaking rules Webster established. They were prohibited from outside contact with family and friends and

could not bring them to the residences, nor could they tell others where the houses were. The victims were *required* to live in the houses, were isolated from family and friends, were restricted from private pursuits and if they tried to leave the house Webster would track them down and force them back to the residence. The victims were also subjected to brutal punishments inside the residences. Webster created a climate of fear in the residences through his threats and punishment.  In sum, the conditions under which the housing was offered in this case violate nearly all of the principles found in the regulations which would otherwise provide credit for facilities furnished. In essence, the facilities were provided primarily for Webster's benefit, to enable him to better control his victims.  Those factors disqualify the facilities, and preclude any credit toward the statutory wages due.

The final column requiring explanation is the "Liquidated Damages" one. Under the FLSA, if any employer fails to timely pay wages due, that employer is required to pay liquidated damages in an amount equal to the back wages to compensate for the payment delay.  Such double damages were recently awarded in *United States v. Sabhnani*, 566 F. Supp. 2d 139, 143-144 (E.D.N.Y. 2008), which was a similar forced labor case.

IV.  **WEBSTER'S FINANCIAL CIRCUMSTANCES ARE IRRELEVANT TO CALCULATION OF RESTITUTION OWED**

Under 18 U.S.C. § 1593, a defendant's ability to pay is not relevant to determination of the restitution figure, though it may influence the repayment schedule the court sets. *See* 18 U.S.C. § 1593(a) (mandating restitution in "full amount of victim's losses" and directing enforcement "in accordance with section 3664"); 18 U.S.C. § 3664(f)(1)(A) & 3663(f)(2) (providing that victim's losses should be determined "without consideration of the economic circumstances of the defendant," though such circumstances can influence repayment schedule). Under the plain language of the statute, these eleven women are owed "the greater of the gross income or value to the defendant of the victim[s'] services or labor or the value of the victim[s'] labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.)." In this case, the greater of the two amounts is $3,615,750.

//

//

//

//

//

RESPECTFULLY submitted this 10th day of October, 2008, at Anchorage, Alaska.

> NELSON P. COHEN
> United States Attorney
>
> s/Kimberly R. Sayers-Fay
> KIMBERLY R. SAYERS-FAY
> Assistant U. S. Attorney
> Federal Building & U.S. Courthouse
> 222 W. 7th Avenue, #9, Rm. C-253
> Anchorage, AK  99513-7567
> Phone: (907) 271-5071
> Fax: 907-271-1500
> email: kim.sayers-fay@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2008, a copy of the foregoing, was served, via emial, on:
Attorneys Michael Dieni and Mary Geddes

s/Kimberly R. Sayers-Fay