Mary C. Geddes
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>DON ARTHUR WEBSTER, JR.,<br><br>                Defendant. | Case No. 3:06-cr-00096-HRH<br><br>**DEFENDANT'S RESPONSE TO THE GOVERNMENT'S SECOND SUPPLEMENTAL BRIEF ON RESTITUTION (Docket No. 526)** |

**I.     Introduction**

      A.     Background

Don Webster was first indicted in the case for crimes of sexual trafficking in December 2006. He was convicted in a jury trial on February 5, 2008. Title 18 U.S.C. § 3664(d), requires that:

> (1)   Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution.

Webster was initially scheduled to be sentenced on April 25, 2008; sentencing was first delayed until June 10, 2008, and then to August 15, 2008. Criminal Rule 32(c) ("Presentence Report") states at (1)(B) that: "If the law requires restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution." The government made no submissions on the matter of restitution in advance of the draft PSR, not in objections to the PSR, and not otherwise in advance of the final report.[1]

---

[1] Three victims had submitted victim impact statements: Wendy Ross (para. 88), Brenda Shields (para. 86), Rayna Sullivan (para. 87). In those statements, the three did identify harms they had suffered as a result of the crime. One of them even indicated she had suffered financial losses. Both neither the PSR writer nor the government indicated that these victims were seeking restitution.

In a redacted statement included in the PSR, Brenda Shields stated that her heavy addiction to crack cocaine led to "prostitution [sic] became a way of life to me and the only way of life I knew[,] this rendering me completely dependent on Don Webster severely impacting my health and my life leaving me with severe mental, physical, emotional and social anguish caused by Don Webster." (Para. 86)

Despite this reportage, the PSR provided no information as to whether Brenda Shields had received – or still required – treatment for her reported drug and health problems, nor for the 'severe mental anguish' she mentioned. Nor was there any indication that Ms. Shields was seeking other forms of assistance, such as vocational training  Notably, the government's demand for restitution does not concern itself with any of Ms. Shields' complaints.

The PSR reported that Wendy Ross experienced the following reactions to Webster's crime: "anger, anxiety, fear, grief, guilt, numb[ness], sleep loss, nightmares, physical health change, trouble concentrating, repeated memory of crime, chronic fatigue, uncontrolled crying and depression." (Para. 27)

Despite this reportage, the PSR did not indicate that treatment had been – or would be – required by Ms. Ross for these conditions. Again, notably, the government's demand for restitution does not concern itself with any of Ms. Ross's complaints.

Rayna Sullivan said she had experienced "financial trauma" due to "having been in treatment" and "I have restitution that I pay to being in and out of jail [sic] after being with Jerry." (Para. 89) She also mentioned that there is "[t]he cost of attorney fees that had to be paid by the state [sic]." Also, "the money that my spouse and family had to help come up with for counseling and other things." Finally, she states, "When I think of all the money I put in [Webster]'s pocket makes me sick. I should not be so in debt." (*Id*.)

Despite this reportage, the PSR does not specify when, where and why Ms. Sullivan had been in treatment, what costs her family paid for her treatment, what "restitution" she had to pay, what "attorney fees" she mentioned, nor what total amount of money she believed Webster owed her.

As a result, the final PSR listed no amounts for restitution, and stated at ¶ 316 that: "The amount of restitution owed to the victims in this case has not been determined to date."

Title 18 U.S.C. § 3664(d)(5), requires that:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

In fact, the required initial notice that restitution amounts had not yet been determined was not provided 10 days before the sentencing hearing. As a result, the defendant's sentencing memorandum (section J), filed on August 8, noted that: "There has been no request for restitution."

The government's sentencing memorandum, filed seven days before the scheduled August sentencing, stated that:

> The United States Department of Labor (DOL) "has been trying to calculate the amount of restitution Webster owes his victims in this case. As of this filing, that information has not been provided. As soon as available, the information will be provided to the Court and defense counsel."

No estimates were provided. No good cause for the delay in the production of this information was shown. Perhaps anticipating the court's displeasure at its lack of compliance with § 3664, the government suggested that, as an alternative, the court could determine restitution on the basis of trial evidence concerning Violent Crimes Compensation Board awards. While 18 U.S.C.

§ 3664(f)(1)(B), would have allowed for restitution of victim losses even when compensatory payments had been received by victims, the government never submitted such amounts to the PSR writer, and the court demurred proceeding in this manner.[2]

The court did see fit to extend the time for restitution determination, and set a hearing for October 31, 2008. In a written order, the court cautioned:

> In the meantime, the court expects the Government and the probation service to collaborate for the purpose of effecting full and complete compliance with the procedures set forth in 18 U.S.C. § 3664 to the end that the court receive, at least 21 days in advance of the foregoing date, a supplemental report on the subject of restitution.

The government nevertheless ignored this directive from the court for a timely submission to the PSR writer. But ultimately, the court reviewed the government's restitution demand predicated on the basis of a DOL hour and wage extrapolation. The court held an evidentiary hearing in early

---

[2] This court will recall that – prior to trial – all the eleven victims of the counts of conviction were contacted at one time or another by the FBI and its Victim Witness Specialist. That Specialist provides information about available financial assistance and benefit programs. The Specialist also notified the victims of the benefits available through the state Victims Crime Compensation Board (VCCB). The FBI Victim Specialist assisted victims Scroggs, Littlefield, Moore, Sullivan, Hewlett, and Beasley with VCCB applications. (Ex. A)

The defense cannot, at this juncture, cite how much compensation each of the victims did receive from the VCCB as the defense was not allowed to maintain the VCCB information and such information was not submitted to nor collected by the PSR writer. The VCCB application and process encourages victims to indicate whether they require medical treatment, counseling or other items, but only if such needs are related to the crimes committed against them.

However, it is the undersigned's recollection that not one of these applicants claimed in their applications that she had lost wages or income as a result of Mr. Webster's crimes, even though the form indicates that type of compensation is available. (*See* Ex. B.)

Indeed, the presentence report, filed on August 4, 2008, at docket 405-2, reflected no claim for restitution had been submitted by the victims or, for that matter, by the government.

January and seemed unpersuaded as to the reliability of the factual basis for the specific calculations, and the applicability of the wage and hour analysis to the circumstances in this case.[3]

The court has asked the parties whether Mr. Webster can be ordered to, in effect, disgorge gross income under the mandatory restitution statute and to consider how that would be determined. In response, the government now contends that restitution is owing for all of the gross proceeds of escort services earned at any time by the adult and child victims who were involved in the counts of conviction, and it proposes a way to determine that.

Mr. Webster only agrees that restitution can be ordered for the two child victims in this case.

B.  The Relevant Statutes

As this court has previously noted, and notwithstanding the provisions of 18 USC 3663 and 3663A, section 1593(b)(1) makes restitution for any offense under 18 USC section 1591 "mandatory." In cases where an offense has resulted in physical injury, compensation for medical, psychological, psychiatric and non-medical treatment can be ordered. See also, e.g, 18 USC section 3663A(B)(2)(A).

Additionally, "[t]he order of restitution under this section shall direct the defendant to pay the victim ... the full amount of the victim's losses," 18 USC § 1593(b)(1), and those losses "shall ... include the greater of the gross income or value to the defendant of the victim's services or

---

[3] The wage and hour minimums for determining the value of a victim's labor to the defendant are prescribed for all offenses under Chapter 77 of the United States Code. Chapter 77 offenses concern involuntary servitude, peonage, slavery, forced labor, as well as sexual trafficking. See United States v. Chang Da Liu, 538 F.3d 1078 (9th Cir. 2008)(verdicts of foreign transportation for prostitution, transportation of persons in execution of fraud, and sex trafficking in case where Chinese women were falsely lured to the Marianas with signed job contracts for hotel and restaurant jobs and required to prostitute..

labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act ."  Id. § 1593(b)(3).

Restitution shall be ordered under mandatory restitution statutes <u>but only as long as it is reasonably calculable and not based on speculation</u>.  *Cf. U.S. v. Cienfuegos*, 462 F.3d 1160, 1161 (9th Cir. 2006).

After this court indicated, at its last hearing, that it lacked confidence in the accuracy of a minimum hour and wage determination, the government has now argued the alternative, i.e. that restitution can be determined from the "the gross income or the value" to the defendant of the victims' labor. See 18 USC section 1593(b)(3).

## II.    Why the Government's Restitution Demand For the Adult Victims Is In Error

Instead of meaningfully responding to the three victims' impact statements, or specifically proving up its claims with a focussed evidentiary hearing as to the number of times the adult women were coerced into commercial sex acts, the government has asked the court to find facts based on inferences, many of which are not reasonable in light of contradictory trial testimony. And, consequently, instead of a meaningful inquiry into victims' needs, we have a largely-hypothetical exercise.[4]  The government ignores the fundamentals of restitution.  Restitution is

---

[4]    In considering the manner and schedule of payment, the court is required to consider the defendant's financial resources, assets, projected income, and financial obligations, based on an affidavit supplied by the defendant. See 18 U.S.C. § 3664(d)(3) & (f)(2).  The court may then "direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." 18 U.S.C. § 3664(f)(3)(A). The court also may allow nominal payments if the defendant's financial situation does "not allow the payment of any amount of a restitution order, and [does] not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 U.S.C. § 3664(f)(3)(B). Obviously, that's the case here, where Mr. Webster is

remedial.  Loss determinations are factual.  The court is expected to make its determinations in an expedient manner. Loss determinations must be made with reasonable certainty.  And restitution does not encompass punitive damages.

For its mandatory restitution claim, the government initially relied solely upon the hour and wage methodology.  After the court determined that this methodology was inapposite for the circumstances presented in this case, the government now advocates for the "gross income" method of determining restitution. The government asks that Mr. Webster must be ordered to, in effect, pay back money they earned as escorts. In its calculations, the government has bootstrapped the determinations made by the court with respect to drug distribution, and contends that the women were "sexually trafficked" with respect to all of their dates and all of their days that they worked as escorts.

But the underlying premises – under either method – are faulty.  The government wants the court to infer that, merely because Mr. Webster was convicted of sexual trafficking by force, fraud or coercion, every day in which a woman chose to live in one of his residences was a day on which "she was trafficked," that is, a day on which she engaged in an act of commercial sex as a result of coercion.[5]  And that every date, on every day, involved coerced commercial sex.

These are not reasonable inferences, as previous stated, for the determination of restitution.

---

indigent, in his 50's, and about to serve a 30-year sentence of imprisonment.

[5]  The language of the statute requires proof of but one forced or coerced commercial sex act . 18 USC section 1591.

*United States v. Don Arthur Webster, Jr.*  Page 7
Case No. 3:06-cr-00096-HRH

First, the jury verdicts have limited import because, with respect to each adult victim, the jury had to determine only if force, fraud or coercion had caused her to engage in but a single act of commercial sex within each time frame specified in the indictment.

Second, not all "dates" involved commercial sex acts, yet the PSR has erroneously presumed that 100% of the dates did include them. There were no jury findings on this issue, and not every woman was asked to specify what percentage was applicable. But there was testimony which underlines the significant impact of this erroneous presumption. Jessica Houser testified that some dates only wanted company. (Tr. 10-10) She said that only 6 out of 10 dates involved a sex act, as some clients just wanted massages or company. (Tr. 10-22) On a date, she said, "you either have sex or you do a blow job or you do nothing at all, then you come home." (Tr. 10-22) Hannah Beasley also agreed that some dates only wanted company. She also estimated that only 60% of her dates involved sex. (Tr. 4-44, 104) Based on Houser's and Beasley's testimonies, then, the number of sex acts would be overestimated by 40%.

Third, the evidence is insufficient to establish that all – or even a majority – of the adult women's commercial sex acts were coerced.  Restitution can only include losses directly resulting from a defendant's offense. *United States v. Bussell,* 504 F.3d 956 (9th Cir. 2006)

There were several occasions described at trial in which a victim was either not interested in going on a date or had not handed over all of her date receipts or had otherwise violated the house rules and it was said that Webster had been violent and scary. Nonetheless, the trial testimony established that the women had acted volitionally on many if not most of the days and weeks and months and years during which they lived in Webster's houses. The women all agreed they chose to move into Webster's houses and to work for him as escorts. Many said Webster's

operation represented an improvement in their personal circumstances.[6] All of the women testified that they went on dates without being forced to do, and that it was the woman's choice whether to engage in sex acts during the dates.[7] The women said they sought to go as many dates as possible. Even when abstaining from drug use, women chose to live in Webster's houses and work as escorts.[8] All of the women agreed that nobody had forced drugs on them.[9] Even after reportedly experiencing bad treatment from Webster or viewing it, many of the women voluntarily <u>returned</u> to live and work

---

[6] Rayna Sullivan testified that she made the choice to move into Webster's house, and that she was not forced to do so. (Tr. 11-183, 188)  Jessica Houser joined Webster's escort services voluntarily (Tr. 10-39) and was relieved to know she would have a roof over her head "for a long time." (Tr. 10-7)  Brenda Shields thought Webster's offer of a place to stay was preferable to living on the streets. (Tr. 6-5)  So did Mary Weatherman. (Tr. 8-4, 8-5)  Wendy Ross said she wanted to work for Webster in exchange for crack and a place to live. (Tr. 12-8)  Amy Moore had some problems where she was living (Tr. 9-45), and she 'had the idea' she would work for Webster, *i.e.* going on "calls" to provide sex for money. (Tr.9-7)

[7] Rayna Sullivan agreed she went voluntarily on her first "call" for commercial sex. (Tr. 11-177).  Hannah Beasley said she wanted to go on dates. (Tr. 4-113)  Tyshika Rainey said she would go on as many dates as she could. (Tr.10-14)  Mary Beth Weatherman wanted to do as many dates as she could so she could get more crack. (Tr. 8-20)  Brenda Shields said she was never forced to go on dates. (Tr. 6-44)  Jessica Houser said that "it really didn't matter how many dates you went on," and that what a date involved (in terms of sex) "was totally up to you." (Tr. 10-10)  Mary Weatherman confirmed that it was always her choice whether to have sex with a client. (Tr.8-6)

[8] Jessica Houser said she was paid $40-50 cash for each date while she was clean and not using drugs. (Tr. 10-37)  Webster had her, ML, and Tyshika Rainey live in a drug-free residences to support their abstinence. (*See*, *e.g.* Tr. 10-34, 10-36)  Wendy Ross said that Webster encouraged her to get clean and sober. (Tr. 12-83)  SH testified that Webster maintained a drug-free residence, and that she stayed there with ML and another woman for months at a time. (Tr. 8-77)

[9] Rayna Sullivan said no one forced her to use crack. (Tr. 11-179)  Hannah Beasley said that Webster did not compel her to use drugs. (Tr. 4-97)  Tyshika Rainey said she had been using crack for 3-4 years before meeting Webster. (Tr. 10-7)  Brenda Shields said she was a crack addict, using it "whenever she could," before she met Webster. (Tr. 6-14)  She testified that she was not forced to go on dates or use crack during her time with Webster. (Tr. 6-44)  Mary Beth Weatherman had been using cocaine for about 3-4 years before she met Webster, and nobody forced her to do drugs. (Tr. 7-55)  Amy Moore said her drug use was voluntary. (Tr. 9-64)  Ashley Scroggs said no one forced her to do drugs while living at Webster's. (Tr. 7-130)

in Webster's escort business after days off, vacations, family visits, time in jail, drug treatment, getting kicked out, and many other reasons for leaving.[10]  In sum, the trial testimony did not establish that the adult women were forced to live there and coerced into commercial sex acts, *every time*. Yet that is the false construct in the restitution calculations presented to this court.

Fourth, the daily and weekly "averages" and "totals" stated in the supplemental PSR documents cannot be reliably determined from the trial record.  For example, Jessica Houser never testified that she performed a weekly average of 30 "commercial sex acts" during each of "222 weeks."  In fact, at trial, she said that she could not say how many "dates" took place in a "normal week." (Tr. 10-18)  Similarly, Hannah Beasley never testified that she performed 2,625 "commercial sex acts".  These figures are not merely extrapolations; they are *the government's interpretations* of testimony. For example, the "averages" do not account for the testimony from both Beasley and Houser that 40% of their dates did not involve sex.  (Tr. 10-22) (Tr. 4-44, 4-104)

Furthermore, "averaging" is not reasonable when the number of dates varied wildly on a day-to-day basis and, for some, on a year-to-year basis.  For example, ML testified that there were days with no dates. (Tr. 14-186) Amy Moore estimated the number of "dates" per day as ranging from "one to four, five." (Tr. 9-9)  But she never testified that there was a daily average of two dates for each of 77 weeks, as the PSR writer has presumed.[11]  Rayna Sullivan may have – at

---

[10]   Brenda Shields said she got days off.  (Tr. 6-54)  Rayna Sullivan came back after vacationing with her mom and visiting with her son.  (Tr. 11-196)  Amy Moore traveled to Washington state to visit her dad and then returned to the escort service.  (Tr. 9-61)  There was one or two other times when she left and later returned.  (Tr. 9-33, 9-61)  Wendy Ross left the escort service twice, with no repercussions.  (Tr. 12-74) Ashley Scroggs said she came back to "make some quick money." (Tr. 7-109)

[11]   Amy Moore was also unsure about the length of her employment, stating it was "maybe" a year and one-half.  (Tr. 9-33)  Moore was also completely unable to remember what months and

one point – gone on as many as three dates a day (Tr. 11-90), but she also testified that she had fewer dates whenever Webster was using crack. (Tr. 11-90) Webster was using crack for an unspecified number of years. Thus, there was no average number of dates which could be ascertained from Sullivan's trial testimony.

Fifth, some of the women took cash from date money even before Webster ever received it. Both Amy Moore and SH reported on this practice; and both reported that they would sometimes keep $20 out of every 100. (Tr. 8-54; Tr. 9- __) Other women said they kept date money to buy their own drugs. But the presumed gross income does not reflect such deduction, and there are no offsets for "room and board" compensations benefiting the women.

Restitution must be ordered but only when a victim was "directly and proximately harmed" by the offense conduct. *See United States v. Meksian*, 170 F.3d 1260, 1263 (9th Cir.1999). The government has not produced sufficient evidence in this proceeding which is sufficient to establish that it was force, fraud or coercion that caused these adult women to engage in the vast majority of their many commercial sex acts. The causal chain may not extend so far in terms of the facts, or the time span, as to become unreasonable. *See United States v. Gamma Tech.*, 265 F.3d 917, 928 (9th Cir.2001). [12]

---

which year she worked for the escort service. (Tr. 9-62) Despite Moore's hesitancy in remembering the term of her employment, the PSR writer has simply presumed that she worked for 77 weeks.

[12] The government has suggested that the Doe case shows that our circuit court considers restitution determinations to be more like an "art than an exact science." *United States v. Doe*, 488 F.3d 1154 (9th Cir. 2007). That decision says no such thing. In Doe, the court merely ascertained the reasonableness of a restitution award, which required the defendant to pay for monthly counseling sessions for the victims over a two year period, even though the need for the length of treatment could not be absolutely determined in advance.

And furthermore, the Ninth Circuit insists that "in establishing the facts, including approximations, underlying a sentence, the district court utilize only evidence that possesses sufficient indicia of reliability to support its probable accuracy." *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1148 (9th Cir. 1999). Based on all of the foregoing objections, this court must conclude that restitution for the adult victims is not reasonably calculable based on the trial testimony alone, the only evidence relied upon by the government for its application..

### III.  Why the Government's Demand for the Child Victims Is Inaccurate

It is possible to reasonably infer a daily victimization with respect to one of the two juveniles involved, ML, as she was engaged in commercial sex acts during the eight weeks before her 18th birthday. According to the undersigned's notes (the undersigned lacks a transcript) ML testified that there were days with no dates and the average was 1-2 dates a day. (Tr. 14-186) The government assumes a higher daily average. In light of ML's testimony, Mr. Webster has no objection to a restitution order based upon a fair assessment of gross income in the amount of $16,500 ($150 x 7 x per week x 8 weeks).

With respect to juvenile SH, she testified that she initially went behind the defendant's back and that he was initially ignorant of her involvement with commercial sex. However, she also testified that she personally handed him money from dates on 100 occasions. (Tr. 8-84) She said that she handed the money to Webster after 50-75% of her dates. (Tr. 8-54,8-56) She said that she often kept $20 out of the $100 paid her for a date. (Tr. 8-54) The gross income Webster would have realized from each of SH's dates would therefore have been $80. SH also said that, out of every ten dates, she would not have sex with two of the dates. (Tr. 8-64) Assuming that SH gave the money

to Webster on 75% of the occasions she went on dates, and she gave it to him on 100 occasions, she would have gone on 133 dates. Since SL testified that she refused to have sex with (every) two clients out of ten, she had commercial sex on 106.4 out of 133 dates; 106.4 multiplied by $80 equals $8,512 in gross income. Therefore, $8,512 of restitution would be indicated for SH.

**IV.     Conclusion**

Even orders of mandatory restitution must be based on real losses directly and proximately related to the offenses of conviction. The trial court's determination of such losses is factual, not speculative, and must be justified by evidence on the specific matters for which restitution is to be given . In this case, the government has established only that restitution is owing to the child or minor victims of Mr. Webster's sexual trafficking offenses.

DATED this 25th day of February 2009.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Mary C. Geddes
Assistant Federal Defender
Alaska Bar No. 8511157
601 West 5th Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mary_geddes@fd.org

<u>Certification</u>:
I certify that on February 25, 2009, a copy of the foregoing document, with attachments, was served electronically on:

Audrey Renschen, Esq.
Alexandra R. Gelber, Esq.
Kimberly R. Sayers-Fay, Esq.

/s/ Mary C. Geddes
_____